# EXHIBIT E

FILED

THE UNITED STATES DISTRICT COURT 2017 JUN 23 PM 12: 53
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION   CLERK DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | |
|---|---|
| **STEVE WENTZ,** | ) |
| | ) |
| Plaintiff, | ) Civil Action No. |
| v. | ) |
| | ) 6:17-cv- 1164-ORL-18GJK |
| **PROJECT VERITAS,** a Virginia | ) |
| corporation; **JAMES O'KEEFE III,** | ) |
| an individual; **ALLISON MAASS,** | ) |
| an individual; and | ) |
| **BREITBART NEWS NETWORK, LLC,** a | ) |
| Delaware company, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

COMES NOW Plaintiff, STEVE WENTZ, by and through his undersigned counsel, and files this complaint against Defendants, PROJECT VERITAS, JAMES O'KEEFE III, ALLISON MAASS, and BREITBART NEWS NETWORK, LLC.

## SUBJECT-MATTER JURISDICTION

1.    This action arises under 18 U.S.C. § 2520 and therefore, this Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

2.    This Court has pendent jurisdiction over the state law claims related to section 934.10, Florida Statutes; section 22-2518, Kansas Statutes; and defamation, as they derive from the same common nucleus of operative facts as the federal claims.

## PERSONAL JURISDICTION & VENUE

3.     Defendant PROJECT VERITAS is a Virginia corporation whose principal address is in Westchester County, New York.

4.     Defendant ALLISON MAASS is an individual who, upon information and belief, resides in Hennepin County, Minnesota.

5.     Defendant JAMES O'KEEFE III is an individual who, upon information and belief, resides in New York.

6.     Specific Personal jurisdiction is proper in Florida over Defendants PROJECT VERITAS, ALLISON MAASS, and JAMES O'KEEFE III, pursuant to section 48.193(1)(a)2, Florida Statutes, because they committed tortious acts in Florida. As explained in Counts I and III herein, Project Veritas and Maass intercepted a secret unauthorized recording of Plaintiff in Florida; O'Keefe and Project Veritas procured a secret unauthorized recording of Plaintiff in Florida; and O'Keefe and Project Veritas disclosed an intercepted conversation in Florida.

7.     Defendant BREITBART NEWS NETWORK, LLC is a Delaware company headquartered in California.

8.     General Personal Jurisdiction is proper in Florida over Defendant BREITBART NEWS NETWORK, LLC ("Breitbart"), under section 48.193(2), because of its substantial, not isolated, ties to and activity within Florida. Breitbart is a rightwing "news" entity

that engages in extensive and pervasive, continuous and systematic, general business in Florida, as shown below:

    a.    It continuously solicits and procures readers and subscribers among millions of Florida residents, and Florida residents remain a large portion of its readership. Breitbart benefits financially from these readers, as it cites to readership numbers when selling advertising and basing its ad rates.

    b.    It further benefits from its Florida readers because it sells items — T-shirts, hats, drinkware, and collectables, including a doormat reading "This home protected by the Second Amendment" — to them through its "Breitbart Store."

    c.    It continually publishes content onto its Facebook page, which is "liked" by about 3.4 million individuals, many of whom are Florida residents.

    d.    A significant number of its advertisers are, and thus it derives ad revenue from, Florida businesses, including, for example, Frank Gay Plumbing, Inc., an Orlando business that caters to only Florida customers; and ACI Universal Payments, which is headquartered in Naples.

    e.    It reports significantly on events and happenings in Florida and maintains "Florida" articles under a "Tag: Florida" section, which features about a new article targeting Florida each day, at http://www.breitbart.com/tag/florida/, and includes local stories, including, for example, an alleged "food stamp fraud" in South Florida; an Ocala resident tackling a shooter outside an Ocala Wing House restaurant; Kellogg's layoffs in Weston, Florida; the alleged hacking of information of Florida concealed-weapon permit holders; and, of course, Trump's many goings-on at Mar-a-Lago.



  f. It frequently sends its own agents (reporters) directly to Florida for the purpose of covering events such as the 2016 Florida Republican primary; Trump's multiple rallies in Florida; Trump's June 16, 2017, speech in Miami, and more.

  g. It employs, as reporters or contributors, Florida residents who write their content and submit it to Breitbart's editors from Florida.

  h. Steve Bannon, its news executive at the times relevant herein, was, at the time, a Florida resident, registered to vote in Florida.

  i. It broadcasts commentary on satellite radio (Sirius), which broadcasts into Florida and receives and broadcasts listener calls from Florida residents.

9. Pursuant to 28 U.S.C. § 1391 venue is proper herein as a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

<u>FACTUAL ALLEGATIONS</u>

10. Defendant Project Veritas is a right-wing organization that creates and distributes heavily edited propaganda videos with agendas to "embarrass or ensnare liberal groups"[1] and "force people to resign."[2]

---

[1] *See, e.g.*, Ron Claiborne and Ben Forer, *James O'Keefe Ensnares Liberal Groups Using Actors and Hidden Cameras*, ABC NEWS, Mar. 9, 2011, http://abcnews.go.com/US/james-okeefe-ensnares-liberal-groups-actors-hidden-cameras/story?id=13094204; *James O'Keefe III attempt to sway the 2016 campaign*, NEW YORKER, May 30, 2016, http://www.newyorker.com/magazine/2016/05/30/james-okeefe-accidentally-stings-himself.



11.   Project Veritas is run and operated by its president, JAMES O'KEEFE III, who, in such operation, has been labeled "a leading practitioner of political warfare"[3] and a "conservative provocateur."[4]

12.   O'Keefe and Project Veritas are masters of propaganda. Even the name "Project *Veritas*," which incorporates the Latin word for "truth," is a euphemism for what would more aptly be called, "Project Deception."

13.   O'Keefe and Project Veritas refer to their operatives as "journalists" and "investigative reporters"; however, Project Veritas, O'Keefe, and these operatives do not adhere to the Society of Professional Journalists Code of Ethics or the basic tenets of journalism.[5]

---

[3] *Id.*, note 1.

[4] Stelter, Brian, *Conservative provocateur James O'Keefe is setting his sights on CNN*, CNN, Feb. 22, 2017, http://money.cnn.com/2017/02/22/media/james-okeefe-cnn/.

[5] Michael Gerson, *The NPR Video and Political Dirty Tricks*, WASH. POST, Mar. 17, 2011 (opinion), *available at* https://www.washingtonpost.com/opinions/the-npr-video-and-political-dirty-tricks/2011/03/17/ABbyMym_story.html. ("There is no ethical canon or tradition that would excuse such deception on the part of a professional journalist.") (citing to Bob Steele, *Deception/Hidden Cameras Checklist*, POYNTER INSTITUTE (July 5, 2002), http://www.poynter.org/2002/deceptionhidden-cameras-checklist/ (noting that undercover journalism can only be justified on matters of "profound importance" when "all other alternatives for obtaining the same information have been exhausted.")

14. Rather, they use subversive tactics, fake names, and secret hidden cameras,[6] and, under false pretenses, induce people to make specific statements that can be taken out of context.

15. O'Keefe and Project Veritas have developed a style of video editing that is "selective and deceptive," creating final products that "exclude[] explanatory context, exaggerate[]" other aspects, and misattribute quotes.[7]

16. These undercover sting and deceptive editing "tactics are not a new brand of gonzo journalism. They are a sophisticated version of the political dirty trick."[8]

17. By combining the undercover sting tactics and deceptive editing, O'Keefe and Project Veritas do "not merely leave a false impression," but rather "manufacture[] an elaborate, alluring lie."[9]

18. At all times relevant herein, Defendant Maass was an operative of — or so-called "investigative reporter" to — Project Veritas and O'Keefe.

---

[6] *See, e.g.,* Stelter, *supra.* (O'Keefe and Project Veritas have developed the tactic of using "undercover stings to trap his targets.")

[7] *Accord*, Gerson, *supra.*

[8] *Id.*

[9] *Id.*

19. Plaintiff, STEVE WENTZ, is an individual residing in Wichita, Kansas.

20. Wentz is, and at all relevant times herein was, a teacher and president of United Teachers of Wichita.

21. On June 26-29, 2015, the National Council of Urban Education Associations (NCUEA) held a conference in Orlando, Florida, which Wentz attended.

22. Project Veritas and O'Keefe sent Maass to the NCUEA convention for the purpose of secretly making video recordings of conversations with members of teacher's unions.

23. The goal shared by Project Veritas, O'Keefe, and Maass was to capture clips of this secretly recorded footage that Project Veritas and O'Keefe could use in videos creating an inference of corruption among teacher's unions.

24. Project Veritas and O'Keefe planned to use these videos the following year in a series designed to discredit teachers unions during the 2016 election cycle.

25. Wentz was one such unsuspecting teacher.

26. One evening during the NCUEA conference, Wentz sat at a bar at the Hilton Orlando Lake Buena Vista.

27. A young woman was also at the bar.

28. Wentz had never seen or met this woman before.



29. She said she was another a teacher attending the conference.

30. She was not, as she told Wentz, a teacher.

31. Unbeknownst to Wentz, this woman was Maass, an operative of Project Veritas.

32. Maass struck up a conversation with Wentz.

33. Secretly, Maass video-recorded the conversation.

34. During the conversation, Maass introduced the topic of misbehaving, out-of-control teenage boys and encouraged Wentz to discuss how he had handled such situations.

35. Wentz recalled, and begun to tell, a particularly memorable anecdote of an incident when he had feigned force, or used "tough love," to connect with, and eventually help a troubled student. The story, as he's told on other occasions, goes, substantially, as follows:

    a. In the 1990s, Wentz was preparing to show a DVD to his history class. Because DVD players were new and the district had not yet bought them, he had used his own funds to buy one, which he kept locked in a cabinet. As Wentz retrieved and began to set up his DVD player, a student muttered something like, "I'm gonna steal that motherfucker." Wentz told the student he wasn't going to steal *that* player because it was *his*, and he wasn't going to just let it go. The kid leaned toward his friend and said something like, "I'm gonna kick his ass."



b.   This boy's in-class comments were indicative that this particular student was headed down a wrong path, possibly into gang, like many teenage boys in Wichita at the time. As a teacher, Wentz strove to connect to his students to show them he cared about them with the hope he could make a difference. And, many times, he did.

c.   Wentz waited until the end of class. Once the other students had left, he told the student something like, "You really wanna kick my ass? You really think I'm a 'motherfucker'? Son, go for it. I'll give you the first shot. But be sure to finish what you start because, if you don't, I guarantee you, I will kick your fucking ass."

d.   The student was silent and looked a little sheepish.

e.   But Wentz did not stop there. "There is another option, however," he said. "Come to class prepared, do your work, don't be a jerk, and you'll find out I'll be your best friend" (paraphrasing).

f.   Wentz said he would advocate diligently for the student and strive to help him succeed. "But only if you meet me half way," because Wentz's effort would be directly proportionate to the student's own effort to help himself, he said.

g.   At the end of that talk, Wentz and the student agreed to put this incident behind them. And they did. The student passed his class without any other incident.

h.   Years later, Wentz ran into that former student, who gave Wentz a hug. The former student asked if Wentz remembered that time he said he could kick his ass. Wentz began to apologize, but the former student laughed and said it was "the best thing

that ever happened to him" because it straightened him out and set him on the right path.

36.   Wentz was particularly proud of the outcome of this incident because he did, indeed, turn the student's life around by giving him the attention and care needed at that time. As such, he has told the story many times.

37.   When a young teacher implied that she herself was faced with challenges of at-risk students, he was happy to relay his story, to show that, by connecting to students in their own, honest way, teachers can make a difference in their lives.

38.   Maass, however — and Project Veritas and O'Keefe — were interested in only a sliver of the story: the "threats" Wentz had feigned prior to encouraging the student to come to class and work.

39.   After the conversation, Wentz did not see Maass again. He had no idea she had taped him; it was simply an anecdote told in a bar to a fellow teacher.

40.   Maass transferred the recording of Wentz to Project Veritas and O'Keefe for editing and eventual publication.

41.   Months later, back in Kansas, Wentz was contacted by a man, Dan Sandini, who told Wentz he was an uncle of one of Wentz's students.

42.   Like Maass had lied about her identity, Sandini also lied about his; he was not related to any of Wentz's students.



43.   Unbeknownst to Wentz, Sandini was a Project Veritas operative.

44.   Sandini requested a meeting with Wentz, who agreed and did meet with him at a Panera.

45.   Like Maass had done in Florida, Sandini recorded the meeting secretly and without Wentz's consent.

46.   During their meeting, Sandini made vague references and accusations about Wentz, without substantiating them with specific facts so Wentz would know what he was talking about, while intending to incite an aggressive reaction for the hidden camera.

47.   Sandini then transferred the recording to Project Veritas and O'Keefe for eventual editing and publication.

48.   Project Veritas and O'Keefe took Maass's and Sandini's footage and pulled from each select clips, which they juxtaposed with O'Keefe's prepared narration, into a single, nine-minute, forty-two-second video about Wentz.

49.   Wentz was targeted because he was the president of United Teachers Wichita, and O'Keefe and Project Veritas were on a mission to discredit teachers' unions during the election cycle.

50.   The video was part of a "series" Project Veritas had made to create an appearance of corruption in teacher's unions.

51.  The video attacked Wentz's integrity as an educator, made him appear violent and dishonest, corrupt, and created an illusion that he played hooky from his job.

*52.*  On or about June 28, 2016, Project Veritas published the video to its official YouTube channel, "veritasvisuals," under the title, *Teachers Union President to Kid: "I Will Kick Your F\*\*\*ing Ass."*[10]

53.  Because Wentz did not know he had been recorded or was a subject of the video, he did not have a reasonable opportunity to discover the recording until after it had been published.

54.  When Wentz did see the video, he was shocked and appalled.

55.  In the video,

    a.  Wentz's face is shown, full-screen, while lyrics instruct the viewer to: "*Look at his face! Look in his eyes! . . . Check out his lies! Lies!*"

    b.  Wentz is depicted as a violent and dangerous man who threatens violence against his students.

    c.  He appears to regale tales of how he "handled" a disruptive student by threatening violence against him.

    d.  The video's narrator, O'Keefe, says Wentz is among "violent teachers" who "engage[d] in questionable behavior."

---

[10]  Available at https://www.youtube.com/watch?v=YheNaAEPev8 (last checked June 22, 2017).



          e.    Wentz is given an appearance as someone who lies and shirks his duties as a teacher and president of the teacher's union. O'Keefe, in his narration, accuses Wentz of not wanting "to own up to his own actions" and using his "union president position to protect himself."

56.    Overall, the video makes Wentz look untrustworthy, corrupt, and makes the union look corrupt.

57.    Project Veritas and O'Keefe published the video also on Project Veritas's website in a category called "corruption."

58.    Shortly after publishing the video, Project Veritas and O'Keefe published additional, written content about Wentz on Project Veritas's website and its Facebook page, and O'Keefe's Facebook page and personal Facebook timeline.

59.    This content accused Wentz, among other things, of "abusing his students"; "abusing children"; and "brag[ging] about abusing kids."

60.    On or about June 28, 2016, Breitbart published an article about the video.

61.    On June 29, 2016, O'Keefe and Project Veritas published on the Project Veritas website a "quick overview about" news

coverage on the video they had released, adding that they had "launched the story with our friends at Breitbart."[11]

62.    At the time of this filing, Breitbart's involvement in the surreptitious video recording, prior to its publication, is unknown. However, Plaintiff reserves the right to include Breitbart in Counts I-IV upon discovery of any such involvement in procuring Project Veritas and O'Keefe to intercept the communications, and notifies all parties of their right to preserve all evidence, including communications, financial records, and more, related to same.

63.    All prerequisites to filing this action have been met, or Defendants have waived them.

64.    On or about June 2, 2017, Wentz, by and through his attorney sent a notice of defamation with notice of duty of preservation of documents to O'Keefe, Project Veritas, and Breitbart. However, the defamatory video and content remains as published on the Internet.

65.    Wentz has incurred attorney's fees in the prosecution of this action.

---

[11] Staff Report, *Media Highlights from Wichita Teachers Union President Investigation,* PROJECT VERITAS, (June 29, 2016) http://projectveritas.com/2016/06/29/media-highlights-from-wichita-teachers-union-president-investigation/



### COUNT I: INTERCEPTION OF ORAL COMMUNICATION
### IN VIOLATION OF 18 U.S.C. § 2521
### (June 2015 incident in Orlando)

66. Wentz incorporates herein by reference all allegations contained in Paragraphs 1-65.

67. Wentz brings this count under 18 U.S.C. § 2520 against Project Veritas, O'Keefe, and Maass for the intentional interception, disclosure, and/or use of his oral communication, and the procuring of that intercepted communication, in violation of 18 USC § 2511.

68. Project Veritas and O'Keefe procured Maass to intercept Wentz's oral communications.

69. In June 2015, while at the Orlando Convention Center, Maass, acting individually and as agent of Project Veritas, used a concealed recording device to intercept and record Wentz's oral communications without Wentz's authorization.

70. The interception and recording of a conversation was O'Keefe's, Maass's, and Project Veritas's conscious objective. With O'Keefe's assistance and tutelage, Maass and Project Veritas installed or placed the recording device surreptitiously in a location with the intention that it record Wentz without his knowledge.

71. After capturing Wentz's oral communications, Maass transferred the recording to O'Keefe and Project Veritas in New York, who used it to create a Project Veritas video on YouTube.

72. O'Keefe, Project Veritas, and Maass had motives to record Wentz secretly so he would say things that, when creatively edited, would make him appear violent and dangerous in the edited video; and to make Wentz, as teacher's union president, appear violent and corrupt, and create an overall impression of corruption in the union and teachers' unions in general.

73. O'Keefe, Project Veritas, and Maass acted intentionally and maliciously, wantonly, willfully, and in bad faith, with gross and reckless disregard for Wentz's rights and interest, without Wentz's consent or approval, and without any good-faith reliance on a court order or legislative authorization for their acts.

74. Wentz did not give his consent or authorization, express or implied, to allow Defendants to intercept these oral communications, procure their interception, or to use the intercepted communications.

75. Sitting at the bar and having a private conversation where there were no visible cameras or recording devices, Wentz had a reasonable expectation that his oral communications with Maass would not be recorded and transferred to a different location and eventually broadcast on the Internet.

76. As a result of Defendants' violation of 18 USC § 2511, Wentz suffered damages to his reputation and emotional damages. Furthermore, Defendants' flagrant and wanton, or malicious conduct give rise to an award of punitive damages.

WHEREFORE, Plaintiff, STEVE WENTZ, respectfully requests that this Honorable Court enter judgment against Defendants PROJECT VERITAS, JAMES O'KEEFE III, and ALLISON MAASS, in accordance with 18 U.S.C. § 2520, for:

a. Equitable relief requiring immediate destruction of the recording and enjoining the further dissemination of it;

b. The greater of:

i. Wentz's actual and compensatory damages suffered plus any profits made by Defendants as a result of the violation, or

ii. Statutory damages of the greater of $100 a day or $10,000; and

c. Punitive damages in an amount to be determined by the jury; and

d. A reasonable attorney's fee and other litigation costs reasonably incurred, pursuant to 18 U.S.C. § 2520(b)(3).

## COUNT II: INTERCEPTION OF ORAL COMMUNICATION IN VIOLATION OF 18 U.S.C. § 2520
### (October 2015 incident in Kansas)

77. Wentz incorporates herein by reference all allegations contained in Paragraphs 1-65.

78.   Wentz brings this count under 18 USC § 2520 against Project Veritas and O'Keefe for the intentional interception, disclosure, and/or use of his oral communication, and the procuring of that intercepted communication, in violation of 18 USC § 2511.

79.   Project Veritas and O'Keefe procured Dan Sandini to intercept Wentz's oral communications at a Panera in Wichita.

80.   In or about October 2015, while at a Panera in Wichita, Project Veritas, acting through Dan Sandini, used a concealed recording device to intercept and record Wentz's oral communications.

81.   The interception and recording of a conversation was the intentional and conscious objective of Project Veritas and O'Keefe. With O'Keefe's assistance and tutelage, Project Veritas (acting through Sandini), installed or placed the recording device surreptitiously in a location with the intention that it record Wentz without his knowledge.

82.   After capturing Wentz's oral communications, Project Veritas (acting through Sandini) transferred the recording to O'Keefe and the Project Veritas office in New York, and O'Keefe and Project Veritas used it to create a video on YouTube.

83.   Project Veritas and O'Keefe had a motives to record Wentz secretly so he would say things that, when creatively edited, would make him appear hostile, corrupt, and shirking his duties;



and to make Wentz, as teacher's union president, appear violent and corrupt, and create an overall impression of corruption in the union and teachers' unions in general.

84.   Project Veritas and O'Keefe acted intentionally and maliciously, wantonly, willfully, and in bad faith, with gross and reckless disregard for Wentz's rights and interest, without Wentz's consent or approval, and without any good-faith reliance on a court order or legislative authorization for their acts.

85.   Wentz did not give his consent or authorization, express or implied, to allow Project Veritas or O'Keefe to intercept these oral communications, procure said interception, or use the intercepted communications.

86.   Sitting at a table in a secluded area of a Panera and having a private conversation where there were no visible cameras or recording devices, Wentz had a reasonable expectation that his oral communications with Maass would not be recorded and transferred to a different location and eventually broadcast on the Internet.

87.   As a result of Project Veritas and O'Keefe's violation of 18 USC § 2511, Wentz suffered damages to his reputation and emotional damages. Furthermore, Project Veritas and O'Keefe's flagrant and wanton, or malicious conduct give rise to an award of punitive damages.

WHEREFORE, Plaintiff, STEVE WENTZ, respectfully requests that this Honorable Court enter judgment against PROJECT VERITAS and JAMES O'KEEFE III, in accordance with 18 U.S.C. § 2520, for:

a.  Equitable relief requiring immediate destruction of the recording and enjoining further dissemination of it;

b.  The greater of:

   i.   Wentz's actual and compensatory damages suffered plus any profits made by Defendants as a result of the violation, or

   ii.  Statutory damages of the greater of $100 a day or $10,000; and

c.  Punitive damages in an amount to be determined by the jury; and

d.  A reasonable attorney's fee and other litigation costs reasonably incurred, pursuant to 18 U.S.C. § 2520(b)(3).

### COUNT III: VIOLATION OF FLORIDA SECURITY OF COMMUNICATIONS ACT (FSCA), FLA. STAT. § 934.10

88.  Wentz incorporates herein by reference all allegations contained in Paragraphs 1-65.

89.  Wentz brings this count under Fla. Stat. § 934.10 against Project Veritas, O'Keefe, and Maass for the intentional interception, disclosure, and/or use of his oral communication, and the procuring of that intercepted communication.

90.  Project Veritas and O'Keefe procured Maass to intercept Wentz's oral communications.

91.   In June 2015, while at the Orlando Convention Center, Maass and Project Veritas used a concealed recording device to intercept and record oral communications between her and Wentz.

92.   Wentz did not give his consent or authorization, express or implied, to allow the interception of these oral communications.

93.   The interception and recording of a conversation was O'Keefe's, Maass's, and Project Veritas's conscious objective. With O'Keefe's assistance and tutelage, Maass and Project Veritas installed or placed the recording device surreptitiously in a location with the intention that it record Wentz without his knowledge.

94.   After Maass intercepted and recorded the oral communications with Wentz, she transferred the recording to Project Veritas and O'Keefe.

95.   Project Veritas and O'Keefe edited the recording to defame Wentz and published the edited version on its YouTube channel, "veritasvisuals," on June 28, 2016, disclosing the contents of Wentz's intercepted oral communications to the public, worldwide.

96.   As a direct and proximate result of Defendants' actions and conduct, Wentz has suffered and will continue to suffer damages, including economic damages, lost revenue/profits,

reputation damages, and damage to his current and prospective business relations.

WHEREFORE, Plaintiff, STEVE WENTZ, respectfully requests that this Honorable Court enter judgment against Defendants ALLISON MAASS, JAMES O'KEEFE III, and PROJECT VERITAS, for Wentz's actual damages, pre-judgment interest, costs, and such other and further relief as this Court may deem proper. Wentz reserves the right to, pursuant to section 768.72, Florida Statutes, amend his complaint and seek punitive damages upon the requisite showing.

**COUNT IV: VIOLATION OF § 22-2518, KANSAS STATUTES**

97. Wentz incorporates herein by reference all allegations contained in Paragraphs 1-65.

98. Project Veritas procured Dan Sandini to interview and secretly record a conversation with Wentz.

99. Shortly after the convention, Sandini contacted Wentz and requested a meeting. Wentz agreed to and did meet Sandini in an isolated section of Panera.

100. Wentz did not give his consent or authorization, express or implied, to allow Sandini to intercept his oral communications with Sandini.

101. Wentz had a reasonable expectation that his oral communication with Sandini would not be subject to interception.



102. During the meeting Sandini, acting on behalf of Project Veritas and O'Keefe, intentionally used a hidden electronic recording device to record and intercept Wentz's oral communications with Sandini.

103. O'Keefe and Project Veritas had a motives to record Wentz secretly so he would say things that, when creatively edited, would make him appear violent and lazy in the edited video, as if he was not doing his job; and to make Wentz, as teacher's union president, appear violent and corrupt, and create an overall impression of corruption in the union and teachers' unions in general.

104. Sandini then transferred the recording to Project Veritas and O'Keefe.

105. O'Keefe and Project Veritas acted intentionally and maliciously, wantonly, willfully, and in bad faith, with gross and reckless disregard for Wentz's rights and interest, without Wentz's consent or approval, and without any good-faith reliance on a court order or legislative authorization for their acts.

106. As a result of this violation, Wentz suffered damages to his reputation and emotional damages.

WHEREFORE, Plaintiff, STEVE WENTZ, respectfully requests that this Honorable Court enter judgment against Defendants PROJECT

VERITAS and JAMES O'KEEFE III for Wentz's actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1000, whichever is greater; reasonable attorneys' fees and other litigation costs reasonably incurred; pre-judgment interest; and such other and further relief as this Court may deem proper. Wentz reserves the right to, pursuant to section 768.72, Florida Statutes, amend his complaint and seek punitive damages upon the requisite showing.

### COUNT V: DEFAMATION (OR DEFAMATION BY IMPLICATION)

107. Wentz incorporates by reference all allegations contained in paragraphs 1-65.

108. This is a count against Defendants Project Veritas and O'Keefe for common-law defamation for the video.

109. Project Veritas and Maass, with O'Keefe's tutelage, secretly took video recordings of Maass's conversations with Wentz.

110. Project Veritas and O'Keefe heavily edited the recordings, omitting most of the reasoning and all explanatory detail from O'Keefe's story, changing the entire context and important elements of Wentz's comments, and cherry-picking the comments that best suited their purpose.

111. Project Veritas and O'Keefe included their heavily edited portions, as well as other images of Wentz they had found



online, in a 9-minute, 42-second video, titled *Teachers Union President to Kid: "I Will Kick Your F***ing Ass."*

112. On or about June 28, 2016, Project Veritas and O'Keefe published this video on YouTube, under the account "veritasvisuals," along with a description that reads:

> The fourth video of the undercover teachers union series shows a **systemic problem of corruption** within the teachers union that extends far beyond New York City. In this fourth video, Steve Wentz, the President of the United Teachers of Wichita **admits to physically assaulting children in the classroom and being protected by the union.**

(Emphasis added.)

113. Project Veritas and O'Keefe also published the video on the Project Veritas website, under the website's "corruption" category, to imply Wentz is corrupt.

114. The video's introduction is about 53 sections:

a. It opens with a gold and blue "Project Veritas" logo while a voice — belonging to Wentz — says, ". . . pull the shades down, take all my shit out of my pockets and go, 'You, you really wanna kick my ass?'"

b. The video cuts to a shaky image of a hotel bar. Wentz, barely in the frame, continues: "'You really think I'm a motherfucker? Son, go for it. And I'll give you the first shot.'"

---

.. Available on YouTube at https://www.youtube.com/watch?v=YheNaAEPev8.



    c.    Maass asks, "You've done this to a student?"

    d.    Wentz: "I've done this more than once. And I said, 'But, I guarantee you, I will kick your fucking ass—' "

    e.    The video makes a clear edit, then cuts to a clip of Wentz saying, "The Union would throw me under the bus. I mean—"

    f.    Maass: Would they?

    g.    Wentz: Are you serious? I mean, yeah. If it was *proven* that I told a kid, "Come at me, hit me, and I'll kick your ass"? Oh yeah, they wouldn't—

    h.    The video cuts to Wentz sitting at a table and puts text on screen, referring to the speaker as "PV JOURNALIST": "His folks are talking about going to the union or gong to the police."

    i.    Wentz replies, "OK, go for it. First of all, I mean, I'm the president of the Union, so—" The bottom fourth of the screen reads, "STEVE WENTZ, PRESIDENT OF UNITED TEACHERS OF WICHITA . . ."

    j.    The bottom fourth says, "PJ JOURNALIST: 'So you're saying it didn't happen?'"

    k.    Then, "STEVE WENTZ, PRESIDENT OF UNITED TEACHERS OF WICHITA: I've never said that to a kid at school."

115. Then, at about 53 seconds, the video cuts to a montage of hand-picked pictures of Wentz's face and screenshots pulled from the previous segment rolling up and down a screen in a flashy filter while a hip-hop song loudly instructs:



> *Sometimes you just gotta tell it like how it is, you know?*
> *Look at his face!*
> *Look in his eyes!*
> *I know you can see it, I know you can see it!*
> **Check out his lies! Lies!**
> **He told us he cared, he told us he cared.**
> **He's feeding us lies.**
> *Look at his face, look in his eyes!*

116. The video cuts to a narrator, O'Keefe, who, emulating a broadcast-journalism tone, à la *60 Minutes,* explains:

> Our "Teacher's Union Investigation" has exposed **union officials who enthusiastically encouraged us to commit fraud, abuse vacation time, cover up drug abuse, and — most disturbing of all — excuse physical abuse of students.** But are there also union officials who used to engage in **questionable behavior** when they were teachers? And, if so, how far up can these **violent teachers** get in the union's ranks?

> **Meet Steve Wentz,** President of the United Teachers of Wichita, who was elected to his first term last year.

> [O'Keefe's narration is interrupted while a video clip, "Believe in Steve," Wentz's campaign video, which was used without Wentz's permission and edited selectively, plays.]

117. The narrator continues, with the following, during which Wentz is shown, in black and white, slow-motion, drinking a beer and placing the near-empty beer glass on the bar top:



> Like many of the union officials we've
> encountered so far, **there's more to Wentz
> than meets the eye.** Shortly after his term as
> UTW president began, Wentz **met with one of
> our undercover journalists at a bar and made
> a disturbing admission.**

118. The video then cuts to a segment of the video Maass

recorded in the hotel bar, and Wentz says:

> Wichita state asked me to come out and talk
> to their new teachers in education about
> classroom discipline, and I went—
>
> [long pause, laughter] ex-military, I'm sure
> you— [laughter]
>
> I mean, you know, there were times in my
> class where I had a kid do something crazy
> and, you know. I told him, when the bell
> rings, I said, "Hey man, hang on. Hang on a
> minute, I want to talk to you." So the bell
> rings, and everybody leaves, and I go over,
> shut the door, lock it, pull the shades down,
> take all my shit out of my pockets and go,
> "You, you really wanna kick my ass? You
> really think I'm a motherfucker? Son, go for
> it. And I'll give you the first shot."

119. Maass asks, "You've done this to a student?"

120. Wentz: "I've done this more than once. And I said, 'But,

I guarantee you, I will kick your fucking ass—'"

121. The video then stops Wentz's story with a clear edit, a

flash of white, and returns to the same scene, with Wentz at the

bar, and the following dialog:



Wentz: The Union would throw me under the bus. I mean—

Maass: Would they?

Wentz: Are you serious? I mean, yeah. If it was proven that I told a kid, "Come at me, hit me, and I'll kick your ass"? Oh yeah, they wouldn't— I mean, I don't know about Virginia, but Kansas would hang my ass out to dry.

Maass: They wouldn't support you?

Wentz: No, No. No, that's over the line——

122. The footage turns to black and white, and the narrator (O'Keefe) speaks over Wentz: "Despite Wentz knowing his actions could get in trouble with the union, would he own up to his admission now that he was the president?"

123. The camera footage changes to the front at the Teacher's Union offices, and the door is opened. The narrator says: "By the time we sent another journalist to confront Wentz about his admission, he was already very comfortable in his new role."

124. The video then spends about a minute on a "journalist" in the union office asking another union staffer where Wentz is, speculating where he might be ("the dentist?" or "a school"), and making it appear that Wentz is *anywhere* but on the job.

125. The narrator, still in the serious, *60 Minutes*-style voice, says, in an ominous tone: "Our journalist noticed that Wentz was marked 'in the office' despite clearly being *out*." The video



zooms in on a whiteboard, and draws a red circle around Wentz's name and a magnet under "IN."

126. The scene cuts to the inside of a Panera — where Wentz had agreed to meet Sandini — and the narrator (still O'Keefe) says:

> When our journalist **finally tracked Wentz down**, it wasn't at a dentist's office or a school; it was at a coffee shop. And **the moment Wentz was asked about threatening students in the past, he turned hostile.**

127. Then a male voice, Sandini, who at all times herein was acting on behalf of O'Keefe and Project Veritas, apparently across the table, explains, "So I'm here visiting relatives and I have a nephew and he is concerned, my family is concerned, and he's been having problems with this, that, you took him aside and said and said that you were going to 'kick his fucking ass.'" Sandini emphasizes the last four words, annunciating each and saying them slowly.

128. Wentz explains that he has no idea what Sandini is talking about, that he is concerned about "the cryptic nature" of everything Sandini says, and Sandini responds, "We're just trying to keep the name of the child out of it."

129. Sandini keeps accusing Wentz of threatening students, and Wentz says, "I have never done that to a kid at school."



130. The video cuts to a black-and-white segment of a tablet sitting on a table, atop many print-outs of images of Wentz, playing a video of the footage of Maass saying, "You've done this to a student?" and Wentz saying, "I've done this more than once."

131. The video cuts back to the Panera. Sandini says that the student's "folks are talking about going to the union or gong to the police."

132. Sandini says, "I gave you my name, I gave you my number, if something changes and you want to come clean . . . If you want to come clean about it, let me know."

133. Wentz tells Sandini that if he wants to talk again, he can talk to Wentz's attorney. Sandini answers, "Is that were you were this afternoon when you were supposed to be at the dentist appointment? . . . I drove all the way down here to talk to you. I show up at your office, you're supposed to be at the dentist at 10, I show up at 2. . . . You've got to post in and post out. Don't you feel responsible to your constituents? . . . Nobody punched you out, nobody punched you in back at the— did you punch out at the office?"

134. Sandini then again accuses Wentz of threatening to "kick his [Sandini's nephew's] fucking ass," Wentz again denies it, and the video again cuts to the black-and-white footage of the tablet



playing Maass saying on video, "You've done this to a student?" and Wentz: "I've done this more than once. . . ."

135. The video closes with the narrator (O'Keefe), again, saying:

> We've been contacted by parents and students
> across the country reacting to our last few
> teacher's union videos about similar
> experiences they have had. Now, we strongly
> encourage any student who has been threatened
> by Mr. Wentz to come forward and contact us
> at projectveritas.com. It's clear Wentz
> doesn't want to own up to his actions and
> will use his *union president* position to
> protect himself. Wentz admits that what he
> did was wrong, and that, if the union found
> out, he would be in trouble. But he isn't
> worried. Why? Because Wentz *is* the Union.

136. The video then cuts again to, and closes with, images of Wentz flashing while the hip hop song sings, "*Look at his face! Look in his eyes! I know you can see it . . . Check out his lies! Lies!*"

137. At the time of filing this lawsuit, the video has had more than 20,400 views and 92 comments.

138. After Project Veritas posted its video to YouTube, excerpts were broadcast by several news stations, including without

limitation, to Wichita stations KWCH, KAKE, and KSCW.[15]

139. This publication is defamatory because:

a. The video description, written on YouTube, is misleading because Wentz is not part of a "systemic problem of corruption," did not "physically assault children" and was not "protected by the union." The description, overall, makes Wentz appear dangerous, violent, and corrupt.

b. The hip hop lyrics, played over images of Wentz, "Look in his eyes!" state, outright, that Wentz is a liar ("Check out his lies! Lies! . . . He's feeding us Lies!"), imply that he does not care about his students ("He told us he cared" (but it was a lie)), and makes him appear deceptive.

c. The video's narration implies that Wentz is corrupt, fraudulent, abuses vacation time, and commits other crimes, which is untrue. It also, outright, states that his behavior is "questionable" and he is "violent," both of which are false.

d. Wentz never "met" with any "journalist," as the video narration implies. Rather, he was set up by someone who faked her identity and deceptively falsely posed as a teacher while covertly and illegally recording him.

e. By stating "there's more to Wentz than meets the eye," in the context provided, implies that he is corrupt, dishonest, and untrustworthy.

f. The use, out of context, of Wentz's story about how he turned around a troubled teenager's life is

---

[15] A "mash-up" of these news stations' coverage of the story can be found at https://www.youtube.com/watch?v=Oo8EpFRzQqO, which was also published by Project Veritas's official YouTube Channel, "veritasvisuals" on June 29, 2016.

